38 F.3d 1218
NOTICE: Ninth Circuit Rule 36-3 provides that dispositions other than opinions or orders designated for publication are not precedential and should not be cited except when relevant under the doctrines of law of the case, res judicata, or collateral estoppel.
 Edward M. KARKAR, Plaintiff-Appellee,
v.
CITICORP; Citibank N.A.; and Citicorp Trust N.A.,
Defendants-Appellants.
 Nos. 92-15353, 92-16047.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted July 15, 1994.
Decided Oct. 18, 1994.
 
 1
 Before: HUG and LEAVY, Circuit Judges, and REAL,* District Judge.
 
 
 2
 MEMORANDUM**
 
 
 3
 Defendants in the trial court, CITIBANK AND CITICORP TRUST, N.A., ("Appellants") appeal from the judgment on a unanimous jury verdict in favor of plaintiff EDWARD M. KARKAR ("Karkar"), finding that Appellants had breached their investment agreement with Karkar and awarding $850,000 for damages resulting from the breach. Appellants also appeal the district court's grant of attorneys' fees to Karkar under English law. Appellants also contend that, if English law applies justifying the award of attorneys' fees, Citicorp and Citicorp Trust are entitled to attorneys' fees as prevailing parties.
 
 SUFFICIENCY OF THE EVIDENCE
 
 4
 Appellants claim that the evidence presented to the jury does not support the $850,000 verdict. Appellant's claim amounts to an argument over the choice between expert testimonies offered by the parties--the Stark opinion versus the Sharaff opinion.
 
 
 5
 Karkar entered into two investment agreements in 1986 for the purpose of having Appellants open and manage discretionary investment accounts for him. These investment accounts, though discretionary, were limited by the instruction from Karkar to Appellants that they invest only in non-U.S. dollar investments. It is the Appellants' investment in U.S. dollar investments that resulted in Karkar's losses when the U.S. stock markets crashed on October 19, 1987.
 
 
 6
 Stark's theory on damages, as presented to the jury on direct examination, was to compare what was agreed to be the value of the non-breaching portfolio, i.e., the August 31, 1987 portfolio, with the actual value of Karkar's portfolio as of December 31, 1987. The difference in value in Stark's opinion was $1 million dollars plus lost interest of $300,000 for a total damage figure of $1.3 million dollars.
 
 
 7
 Appellants argue that Stark's failure to isolate the dollar investments made by Appellants and the assumption that the August 31, 1987 portfolio would have been frozen for four months was an unsound basis for the opinion.
 
 
 8
 An alternate theory of damages was introduced in evidence on cross-examination and redirect examination of Stark. This was a basis for calculating damages advanced by Stark in a deposition prior to trial. Appellants opened the subject of Stark's alternate method of calculating damages that he had testified to in his deposition. In redirect examination, Karkar's attorney asked Stark about this alternate method of damage calculation. In response to questions on redirect examination, Stark testified to the following losses:
 
 
 9
 1. Realized and unrealized losses in U.S. $ 383,067
 securities:
 2. A loss resulting from existing foreign $ 329,584
 currency investments and converting them
 to U.S. dollars:
 3. A loss from an investment in St. Gobain, a $ 107,240
 French stock:
 4. A loss due to the sale of stock after the $ 78,796
 stock market crash:
 5. A loss due to buying U.S. dollars, holding $ 32,584
 them and not investing overseas:
 6. A loss due to the decline of the value of $ 118,227
 the U.S. dollar:
 7. A loss on the call interest because the $ 30,000
 funds were not drawing an appropriate
 interest rate:
 ----------------------
 TOTAL: $1,079,498
 
 
 10
 At final argument, Karkar's attorney conceded that items 3 and 7 should not be considered because these losses did not result from the breach of contract. Deducting the $107,240 and the $30,000 from the total loss, to which Stark testified on cross-examination, left evidence before the jury of damages in the amount of $942,258 on Stark's alternate theory.
 
 
 11
 Appellants contend that this expert testimony was not adequately supported. Appellants' attorney only objected to the testimony concerning the St. Gobain stock. Appellants made no other objection for lack of foundation, or any other ground, to the questions concerning the other items of the alternate damage calculation. This evidence was then properly before the jury. If appellants believed that the calculations lacked an appropriate foundation, it was up to the appellants to object to the questions or, at the very least, move to strike the testimony. They did neither. There also was no request for a limiting instruction concerning the use of that evidence. The jury thus was free to consider this evidence along with other evidence on the issue of damages.
 
 
 12
 Appellants' expert Farhan Sharaff--the employee of Appellants who managed Karkar's account--testified that had he invested only in non-U.S. dollar investments affected by the stock market crash, the loss to Karkar's portfolio would have been $275,000 of realized losses and $95,000 of unrealized losses.
 
 
 13
 These three theories were before the jury for determination of a verdict upon application of the jury instructions. Appellants do not question the accuracy of the instructions to the jury telling them that to find for Karkar they were required: (1) to find that losses were a direct and natural consequence of the breach; (2) to find that Karkar's investments would have a reasonable probability of performing better absent a breach; and (3) to find the amount of loss had been shown with reasonable certainty. The trial court also instructed the jury that damages, if any, would be the difference between the actual financial position of the plaintiff and the position the plaintiff would have been in had there been no breach.
 
 
 14
 The standard of review of a jury verdict is one of substantial evidence to support the verdict. Transgo, Inc. v. AJAC Transmission Parts Corp., 768 F.2d 1001, 1014-15 (9th Cir.1985), cert. denied, 474 U.S. 1059 (1986). In applying this standard of review, the appellate court need only find that the evidence presented is such that reasonable minds would accept the evidence although inconsistent conclusions could be drawn therefrom. Vaughan v. Ricketts, 950 F.2d 1464, 1469 (9th Cir.1991); Landes Const. Co. v. Royal Bank of Canada, 833 F.2d 1365 (9th Cir.1987). The evidence based upon the testimony of Stark is sufficient to support the verdict of $850,000.
 
 ATTORNEYS' FEES
 
 15
 The contract between Appellants and Karkar contained a choice of law provision providing for application of English law to this dispute. Karkar claimed, and the trial court agreed, that in the application of English law, attorneys' fees under the English fee-shifting provision, Supreme Court Act 1981, ch. 54, sec. 51, should be paid to the prevailing party.
 
 
 16
 This case came to the trial court as one invoking the federal law jurisdiction of the court. 28 U.S.C. Sec. 1331; 15 U.S.C. Sec. 78j(b) (1988). The surviving claim is one that the Court decided as an exercise of pendant jurisdiction to the federal claim. 28 U.S.C. Sec. 1367 (1992). Fee shifting under English law is considered a "cost" that differs from the general theory of "costs" in the United States. Under English law the "cost"--meaning attorneys' fees--is part of the cause of action.
 
 
 17
 Appellants argue that "costs" (attorneys' fees) can be awarded only if the action is litigated in an English court. Such an argument misses the point here. This case was decided by the trial court under its then pendant jurisdiction sitting in effect as the English Supreme Court (trial court) with the law of England being applied under the parties' choice of law provision in the contract, the subject of this case. The law of England would permit the court in its discretion to award attorneys' fees. The trial court exercised that discretion by awarding attorneys' fees (costs) to Karkar. There was no abuse of discretion in the trial court's award.
 
 ATTORNEYS' FEES--CITICORP AND CITICORP TRUST
 
 18
 Citicorp claims it should be awarded attorneys' fees (costs) because it is the prevailing party in the defense to Karkar's claim against it. The trial court, in its discretion, denied Citicorp attorneys' fees because the Citicorp entities were all represented by a single law firm and there were no extra attorneys' fees necessary to accomplish Citicorp's defense. There was no abuse of discretion in the trial court's denial of attorneys' fees (costs) to Citicorp. Citicorp Trust is not entitled to attorneys' fees because the verdict was against Citicorp Trust, thus, it was not a prevailing party.
 
 
 19
 The judgment is AFFIRMED.
 
 LEAVY, Circuit Judge, dissenting:
 
 20
 I dissent. The majority erroneously concludes that we may measure the sufficiency of evidence by who offered it or how it got before the jury. That is not correct because we must consider the record as a whole. See Baxter v. Sullivan, 923 F.2d 1391, 1394 (9th Cir.1991).
 
 
 21
 The jury was correctly instructed that Karkar's damages
 
 
 22
 for his investments losses, if any, are the difference between his actual financial position, and the position he would have been in had there been no breach. In determining the amount of damages for investment losses, you should take into consideration the investments that would have been made in his portfolio if defendants had made the investments that plaintiff claims should have been made, or had not made the investments that plaintiff claims should not have been made.
 
 
 23
 Reporter's Transcript, Vol. 6, at 113-14. But where "the damages theory has fundamental problems that make it unacceptable as a whole," it cannot support a judgment. Murphy Tugboat Co. v. Crowley, 658 F.2d 1256, 1261 (9th Cir.1981) (en banc), cert. denied, 455 U.S. 1018 (1982). Karkar offered no evidence as to the probable value of the portfolio had it been invested in foreign markets, as contemplated by the parties. This is the fundamental problem with any of the supposed three theories of damage.
 
 
 24
 Our task is to look for evidence of damage, not just evidence of loss. It is undisputed that the crash that occurred in the equities market in the United States on October 15, 1987, was part of a worldwide event. All equities in all markets lost considerable value. The only evidence on the subject is to the effect that equities in the United States markets lost less than those in foreign markets. Thus, to measure damages, we must compare what Karkar lost from that portion of his portfolio invested in the United States market (the breach) with his position had those same funds been invested in foreign markets. But the evidence the majority relies on does not separate foreign investments from investments in the United States so as to distinguish losses that resulted from the breach from what would have occurred if the investments had been in all non-dollar securities. This is much more than "an argument about the choice between the expert testimony offered by the parties--the STARK opinion versus the SHARAFF opinion." Majority opinion at 2. There is simply no choice where Karkar's presentation totally ignores the performance of foreign markets.
 
 
 25
 The only evidence that would suggest the value of the portfolio had those portions invested in the United States market been invested in foreign markets was the testimony of the appellants' expert, Farhan Sharaff. Sharaff testified that Karkar would have lost an additional $200,000 if he had been invested solely in foreign markets. Reporter's Transcript, Vol. 4, at 28. Thus, the only evidence is that Karkar was not damaged from the fact that not all of his money was invested in foreign markets.
 
 
 26
 From the evidence Karkar presented, no jury could reasonably find what Karkar's position would have been had there been no breach. There was simply no evidence of damage presented.
 
 
 27
 The majority further mischaracterizes the record when it refers to the August 31, 1987 portfolio as the "nonbreaching" portfolio. This portfolio included $1,900,000 in U.S. dollars and a U.S. equity, Bristol-Myers. Karkar testified that he never expected Citicorp to maintain the $1,900,000 in U.S. dollar investments. The cash was in the account on that day because Karkar had recently transferred much of it to Citicorp. For Stark to have "frozen" the portfolio, including almost $2 million in U.S. dollars for four months, was contrary to even Karkar's expectation.
 
 
 28
 I also dissent from the award of attorneys' fees. The investment agreement states: "This Agreement shall be governed by and construed in accordance with the laws of England." There is no provision in the agreement for the award of attorneys' fees or costs in the event of a legal dispute. Thus, there is nothing on the subject of attorneys' fees or costs to construe in accordance with the laws of England.
 
 
 
 *
 The Honorable Manuel L. Real, Chief United States District Judge for the Central District of California, sitting by designation
 
 
 **
 This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by 9th Cir.R. 36-3